# H. J. INC. ET AL. v. NORTHWESTERN BELL TELE-PHONE CO. ET AL.

No. 87–1252.   Argued November 8, 1988—Decided June 26, 1989

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, and STEVENS, JJ., joined. SCALIA, J., filed an opin-ion concurring in the judgment, in which REHNQUIST, C. J., and O'CON-NOR and KENNEDY, JJ., joined, *post*, p. 251.

*Mark Reinhardt* argued the cause for petitioners. With him on the briefs were *Susan Bedor* and *John Cochrane.*

*John D. French* argued the cause for respondents. With him on the brief were *John F. Beukema, James L. Volling,* and *Stephen T. Refsell.**

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Acting Assistant Attorney General Richard, Deputy Solicitor General Bryson, Richard G. Taranto, Joel M. Gershowitz,* and *Frank J. Marine;* and for the States of Arizona et al. by *Robert K. Corbin,* Attorney General of Arizona, *John K. Van de Kamp,* Attorney General of California, *John J. Kelly,* Chief State's Attorney of Connecticut, *Jim Jones,* Attorney General of Idaho, *Frank J. Kelley,* Attorney General of Michigan, *W. Cary Edwards,* Attorney General of New Jersey, *Hal Stratton,* Attorney General of New Mexico, *Lacy H. Thornburg,* Attorney General of North Carolina, and *Jean A. Benoy,* Senior Deputy Attorney General, *Dave Frohnmayer,* Attorney General of Oregon, *Jim Mattox,* Attorney General of Texas, *Kenneth O. Eikenberry,* Attorney General of Washington, *Charlie Brown,* Attorney General of West Virginia, *Donald J. Hanaway,* Attorney General of Wisconsin, and *Joseph B. Meyer,* Attorney General of Wyoming.

Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *Robert*

JUSTICE BRENNAN delivered the opinion of the Court.

The Racketeer Influenced and Corrupt Organizations Act (RICO or Act), Pub. L. 91–452, Title IX, 84 Stat. 941, as amended, 18 U. S. C. §§ 1961–1968 (1982 ed. and Supp. V), imposes criminal and civil liability upon those who engage in certain "prohibited activities." Each prohibited activity is defined in 18 U. S. C. § 1962 to include, as one necessary element, proof either of "a pattern of racketeering activity" or of "collection of an unlawful debt." "Racketeering activity" is defined in RICO to mean "any act or threat involving" specified state-law crimes, any "act" indictable under various specified federal statutes, and certain federal "offenses," 18 U. S. C. § 1961(1) (1982 ed., Supp. V); but of the term "pattern" the statute says only that it "requires at least two acts of racketeering activity" within a 10-year period, 18 U. S. C. § 1961(5). We are called upon in this civil case to consider what conduct meets RICO's pattern requirement.

I

RICO renders criminally and civilly liable "any person" who uses or invests income derived "from a pattern of racketeering activity" to acquire an interest in or to operate an enterprise engaged in interstate commerce, § 1962(a); who acquires or maintains an interest in or control of such an enterprise "through a pattern of racketeering activity," § 1962(b); who, being employed by or associated with such an enterprise, conducts or participates in the conduct of its af-

M. Weinberg and Laurence Gold; for the American Institute of Certified Public Accountants by Philip A. Lacovara, Geoffrey F. Aronow, and Louis A. Craco; for the National Association of Manufacturers by Stephen M. Shapiro, Andrew L. Frey, Kenneth S. Geller, Mark I. Levy, Jan S. Amundson, and Quentin Riegel; and for the Washington Legal Foundation by Daniel J. Popeo, Paul D. Kamenar, and Vicki S. Marani.

Briefs of amici curiae were filed for the Chamber of Commerce of the United States by Stephen A. Bokat, Robin S. Conrad, and Lynn M. Smelkinson; and for Trial Lawyers for Public Justice by Robert M. Hausman.

fairs "through a pattern of racketeering activity," § 1962(c); or, finally, who conspires to violate the first three subsections of § 1962, § 1962(d). RICO provides for drastic remedies: conviction for a violation of RICO carries severe criminal penalties and forfeiture of illegal proceeds, 18 U. S. C. § 1963 (1982 ed., Supp. V); and a person found in a private civil action to have violated RICO is liable for treble damages, costs, and attorney's fees, 18 U. S. C. § 1964(c).

Petitioners, customers of respondent Northwestern Bell Telephone Co., filed this putative class action in 1986 in the District Court for the District of Minnesota. Petitioners alleged violations of §§ 1962(a), (b), (c), and (d) by Northwestern Bell and the other respondents—some of the telephone company's officers and employees, various members of the Minnesota Public Utilities Commission (MPUC), and other unnamed individuals and corporations—and sought an injunction and treble damages under RICO's civil liability provisions, §§ 1964(a) and (c).

The MPUC is the state body responsible for determining the rates that Northwestern Bell may charge. Petitioners' five-count complaint alleged that between 1980 and 1986 Northwestern Bell sought to influence members of the MPUC in the performance of their duties—and in fact caused them to approve rates for the company in excess of a fair and reasonable amount—by making cash payments to commissioners, negotiating with them regarding future employment, and paying for parties and meals, for tickets to sporting events and the like, and for airline tickets. Based upon these factual allegations, petitioners alleged in their first count a pendent state-law claim, asserting that Northwestern Bell violated the Minnesota bribery statute, Minn. Stat. § 609.42 (1988), as well as state common law prohibiting bribery. They also raised four separate claims under § 1962 of RICO. Count II alleged that, in violation of § 1962(a), Northwestern Bell derived income from a pattern of racketeering activity involving predicate acts of bribery and used

this income to engage in its business as an interstate "enterprise." Count III claimed a violation of § 1962(b), in that, through this same pattern of racketeering activity, respondents acquired an interest in or control of the MPUC, which was also an interstate "enterprise." In Count IV, petitioners asserted that respondents participated in the conduct and affairs of the MPUC through this pattern of racketeering activity, contrary to § 1962(c). Finally, Count V alleged that respondents conspired together to violate §§ 1962(a), (b), and (c), thereby contravening § 1962(d).

The District Court granted respondents' Federal Rule of Civil Procedure 12(b)(6) motion, dismissing the complaint for failure to state a claim upon which relief could be granted. 648 F. Supp. 419 (Minn. 1986). The court found that "[e]ach of the fraudulent acts alleged by [petitioners] was committed in furtherance of a single scheme to influence MPUC commissioners to the detriment of Northwestern Bell's ratepayers." *Id.*, at 425. It held that dismissal was therefore mandated by the Court of Appeals for the Eighth Circuit's decision in *Superior Oil Co.* v. *Fulmer*, 785 F. 2d 252 (1986), which the District Court interpreted as adopting an "extremely restrictive" test for a pattern of racketeering activity that required proof of "multiple illegal schemes." 648 F. Supp., at 425.[1] The Court of Appeals for the Eighth Circuit affirmed the dismissal of petitioners' complaint, confirming that under Eighth Circuit precedent "[a] single fraudulent effort or scheme is insufficient" to establish a pattern of racketeer-

---

[1] The District Court also held that, because the MPUC had conclusively determined that Northwestern Bell's allegedly excessive rates were reasonable, the "filed rate" doctrine provided an independent ground for dismissal of the complaint. 648 F. Supp., at 428–429. The Court of Appeals did not consider this issue, and we have no occasion to address it here. Nor do we express any opinion as to the District Court's view that Count II was defective because it failed to "allege the existence of an 'enterprise' separate and distinct from the 'person' identified," as the court held was required by § 1962(a). *Id.*, at 428.

ing activity, 829 F. 2d 648, 650 (1987), and agreeing with the District Court that petitioners' complaint alleged only a single scheme, *ibid.* Two members of the panel suggested in separate concurrences, however, that the Court of Appeals should reconsider its test for a RICO pattern. *Id.*, at 650 (McMillian, J.); *id.*, at 651 (J. Gibson, J.). Most Courts of Appeals have rejected the Eighth Circuit's interpretation of RICO's pattern concept to require an allegation and proof of multiple schemes,[2] and we granted certiorari to resolve this conflict. 485 U. S. 958 (1988). We now reverse.

---

[2] See *Roeder* v. *Alpha Industries, Inc.*, 814 F. 2d 22, 30–31 (CA1 1987) (rejecting multiple scheme requirement; sufficient that predicates relate to one another and threaten to be more than an isolated occurrence); *United States* v. *Indelicato*, 865 F. 2d 1370, 1381–1384 (CA2 1989) (en banc) (rejecting multiple scheme requirement; two or more interrelated acts with showing of continuity or threat of continuity sufficient); *Barticheck* v. *Fidelity Union Bank/First National State*, 832 F. 2d 36, 39–40 (CA3 1987) (rejecting multiple scheme requirement; adopting case-by-case multifactor test); *International Data Bank, Ltd.* v. *Zepkin*, 812 F. 2d 149, 154–155 (CA4 1987) (rejecting any mechanical test; single *limited* scheme insufficient, but a large continuous scheme should not escape RICO's enhanced penalties); *R. A. G. S. Couture, Inc.* v. *Hyatt*, 774 F. 2d 1350, 1355 (CA5 1985) (two related predicate acts may be sufficient); *United States* v. *Jennings*, 842 F. 2d 159, 163 (CA6 1988) (two predicate acts potentially enough); *Morgan* v. *Bank of Waukegan*, 804 F. 2d 970, 975–976 (CA7 1986) (refusing to accept multiple scheme requirement as the general rule; adopting multifactor test, but requiring that predicates constitute "separate transactions"); *Sun Savings and Loan Assn.* v. *Dierdorff*, 825 F. 2d 187, 193 (CA9 1987) (rejecting multiple scheme test; requiring two predicates, separated in time, which are not isolated events); *Torwest DBC, Inc.* v. *Dick*, 810 F. 2d 925, 928–929 (CA10 1987) (holding single scheme from which no threat of continuing criminal activity may be inferred insufficient); *Bank of America National Trust & Savings Assn.* v. *Touche Ross & Co.*, 782 F. 2d 966, 971 (CA11 1986) (rejecting multiple scheme test; requiring that predicates be interrelated and not isolated events); *Yellow Bus Lines, Inc.* v. *Drivers, Chauffeurs & Helpers Local Union 639*, 268 U. S. App. D. C. 103, 110, 839 F. 2d 782, 789 (1988) (requiring related acts that are not isolated events).

## II

In *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479 (1985), this Court rejected a restrictive interpretation of § 1964(c) that would have made it a condition for maintaining a civil RICO action both that the defendant had already been convicted of a predicate racketeering act or of a RICO violation, and that plaintiff show a special racketeering injury. In doing so, we acknowledged concern in some quarters over civil RICO's use against "legitimate" businesses, as well as "mobsters and organized criminals"—a concern that had frankly led to the Court of Appeals' interpretation of § 1964(c) in *Sedima*, see *id.*, at 499–500. But we suggested that RICO's expansive uses "appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of 'pattern'"—both factors that apply to criminal as well as civil applications of the Act. *Id.*, at 500; see also *id.*, at 501–502 (MARSHALL, J., dissenting). Congress has done nothing in the interim further to illuminate RICO's key requirement of a pattern of racketeering; and as the plethora of different views expressed by the Courts of Appeals since *Sedima* demonstrates, see n. 2, *supra*, developing a meaningful concept of "pattern" within the existing statutory framework has proved to be no easy task.

It is, nevertheless, a task we must undertake in order to decide this case. Our guides in the endeavor must be the text of the statute and its legislative history. We find no support in those sources for the proposition, espoused by the Court of Appeals for the Eighth Circuit in this case, that predicate acts of racketeering may form a pattern only when they are part of separate illegal schemes. Nor can we agree with those courts that have suggested that a pattern is established merely by proving two predicate acts, see, *e. g.*, *United States* v. *Jennings*, 842 F. 2d 159, 163 (CA6 1988), or with *amici* in this case who argue that the word "pattern" re-

fers only to predicates that are indicative of a perpetrator involved in organized crime or its functional equivalent. In our view, Congress had a more natural and commonsense approach to RICO's pattern element in mind, intending a more stringent requirement than proof simply of two predicates, but also envisioning a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened the likelihood of, continued criminal activity.

## A

We begin, of course, with RICO's text, in which Congress followed a "pattern [of] utilizing terms and concepts of breadth." *Russello* v. *United States,* 464 U. S. 16, 21 (1983). As we remarked in *Sedima, supra,* at 496, n. 14, the section of the statute headed "definitions," 18 U. S. C. § 1961 (1982 ed. and Supp. V), does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern. Unlike other provisions in § 1961 that tell us what various concepts used in the Act "mean," 18 U. S. C. § 1961(5) says of the phrase "pattern of racketeering activity" only that it "requires at least two acts of racketeering activity, one of which occurred after [October 15, 1970,] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." It thus places an outer limit on the concept of a pattern of racketeering activity that is broad indeed.

Section 1961(5) does indicate that Congress envisioned circumstances in which no more than two predicates would be necessary to establish a pattern of racketeering—otherwise it would have drawn a narrower boundary to RICO liability, requiring proof of a greater number of predicates. But, at the same time, the statement that a pattern "requires at least" two predicates implies "that while two acts are necessary, they may not be sufficient." *Sedima,* 473 U. S., at

496, n. 14; *id.*, at 527 (Powell, J., dissenting).   Section 1961 (5) concerns only the minimum *number* of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts involved.   The legislative history bears out this interpretation, for the principal sponsor of the Senate bill expressly indicated that "proof of two acts of racketeering activity, without more, does not establish a pattern."   116 Cong. Rec. 18940 (1970) (statement of Sen. McClellan).   Section § 1961(5) does not identify, though, these additional prerequisites for establishing the existence of a RICO pattern.

In addition to § 1961(5), there is the key phrase "pattern of racketeering activity" itself, from § 1962, and we must "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used."   *Richards* v. *United States,* 369 U. S. 1, 9 (1962).   In normal usage, the word "pattern" here would be taken to require more than just a multiplicity of racketeering predicates.   A "pattern" is an "arrangement or order of things or activity," 11 Oxford English Dictionary 357 (2d ed. 1989), and the mere fact that there are a number of predicates is no guarantee that they fall into any arrangement or order.   It is not the number of predicates but the relationship that they bear to each other or to some external organizing principle that renders them "ordered" or "arranged."   The text of RICO conspicuously fails anywhere to identify, however, forms of relationship or external principles to be used in determining whether racketeering activity falls into a pattern for purposes of the Act.

It is reasonable to infer, from this absence of any textual identification of sorts of pattern that would satisfy § 1962's requirement, in combination with the very relaxed limits to the pattern concept fixed in § 1961(5), that Congress intended to take a flexible approach, and envisaged that a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set.   For any more specific guidance as

to the meaning of "pattern," we must look past the text to RICO's legislative history, as we have done in prior cases construing the Act. See *Sedima, S. P. R. L.* v. *Imrex Co.,* 473 U. S., at 486–490 (majority opinion); *id.,* at, 510–519 (MARSHALL, J., dissenting); *id.,* at, 524–527 (Powell, J., dissenting); *Russello* v. *United States, supra,* at 26–29; *United States* v. *Turkette,* 452 U. S. 576, 586–587, 589–593 (1981).

The legislative history, which we discussed in *Sedima, supra,* at 496, n. 14, shows that Congress indeed had a fairly flexible concept of a pattern in mind. A pattern is not formed by "sporadic activity," S. Rep. No. 91–617, p. 158 (1969), and a person cannot "be subjected to the sanctions of title IX simply for committing two widely separated and isolated criminal offenses," 116 Cong. Rec. 18940 (1970) (Sen. McClellan). Instead, "[t]he term 'pattern' itself requires the showing of a relationship" between the predicates, *ibid.,* and of "'the threat of continuing activity,'" *ibid.,* quoting S. Rep. No. 91–617, *supra,* at 158. "It is this factor of *continuity plus relationship* which combines to produce a pattern." 116 Cong. Rec., at 18940 (emphasis added). RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.

B

For analytic purposes these two constituents of RICO's pattern requirement must be stated separately, though in practice their proof will often overlap. The element of relatedness is the easier to define, for we may take guidance from a provision elsewhere in the Organized Crime Control Act of 1970 (OCCA), Pub. L. 91–452, 84 Stat. 922, of which RICO formed Title IX. OCCA included as Title X the Dangerous Special Offender Sentencing Act, 18 U. S. C. § 3575 *et seq.* (now partially repealed). Title X provided for enhanced sen-

tences where, among other things, the defendant had committed a prior felony as part of a pattern of criminal conduct or in furtherance of a conspiracy to engage in a pattern of criminal conduct. As we noted in *Sedima, supra,* at 496, n. 14, Congress defined Title X's pattern requirement solely in terms of the *relationship* of the defendant's criminal acts one to another: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." § 3575(e). We have no reason to suppose that Congress had in mind for RICO's pattern of racketeering component any more constrained a notion of the relationships between predicates that would suffice.

RICO's legislative history tells us, however, that the relatedness of racketeering activities is not alone enough to satisfy § 1962's pattern element. To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity. As to this continuity requirement, § 3575(e) is of no assistance. It is this aspect of RICO's pattern element that has spawned the "multiple scheme" test adopted by some lower courts, including the Court of Appeals in this case. See 829 F. 2d, at 650 ("In order to demonstrate the necessary continuity appellants must allege that Northwestern Bell 'had engaged in similar endeavors in the past or that [it was] engaged in other criminal activities.' . . . A single fraudulent effort or scheme is insufficient"). But although proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity, it is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes. The Eighth Circuit's test brings a rigidity to the available methods of proving a pat-

tern that simply is not present in the idea of "continuity" itself; and it does so, moreover, by introducing a concept—the "scheme"—that appears nowhere in the language or legislative history of the Act.[3]  We adopt a less inflexible approach that seems to us to derive from a commonsense, everyday understanding of RICO's language and Congress' gloss on it. What a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter*.  This may be done in a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity.  We can, however, begin to delineate the requirement.

"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.  See *Barticheck* v. *Fidelity Union Bank/First National State*, 832 F. 2d 36, 39 (CA3 1987).  It

---

[3] Nor does the multiple scheme approach to identifying continuing criminal conduct have the advantage of lessening the uncertainty inherent in RICO's pattern component, for " 'scheme' is hardly a self-defining term." *Barticheck* v. *Fidelity Union Bank/First National State*, 832 F. 2d, at 39. A "scheme" is in the eye of the beholder, since whether a scheme exists depends on the level of generality at which criminal activity is viewed. For example, petitioners' allegation that Northwestern Bell attempted to subvert public utility commissioners who would be voting on the company's rates might be described as a single scheme to obtain a favorable rate, or as multiple schemes to obtain favorable votes from individual commissioners on the ratemaking decision.  Similarly, though interference with ratemaking spanning several ratemaking decisions might be thought of as a single scheme with advantageous rates as its objective, each ratemaking decision might equally plausibly be regarded as distinct and the object of its own "scheme."  There is no obviously "correct" level of generality for courts to use in describing the criminal activity alleged in RICO litigation. Because of this problem of generalizability, the Eighth Circuit's "scheme" concept is highly elastic.  Though the definitional problems that arise in interpreting RICO's pattern requirement inevitably lead to uncertainty regarding the statute's scope—whatever approach is adopted—we prefer to confront these problems directly, not "by introducing a new and perhaps more amorphous concept into the analysis" that has no basis in text or legislative history.  *Ibid.*

is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated. See S. Rep. No. 91–617, at 158.

Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case. Without making any claim to cover the field of possibilities—preferring to deal with this issue in the context of concrete factual situations presented for decision—we offer some examples of how this element might be satisfied. A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. Suppose a hoodlum were to sell "insurance" to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the "premium" that would continue their "coverage." Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently estab-

lished where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. Such associations include, but extend well beyond, those traditionally grouped under the phrase "organized crime." The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise." [4]

The limits of the relationship and continuity concepts that combine to define a RICO pattern, and the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a "pattern of racketeering activity" exists. The development of these concepts must await future cases, absent a decision by Congress to revisit RICO to provide clearer guidance as to the Act's intended scope.

### III

Various *amici* urge that RICO's pattern element should be interpreted more narrowly than as requiring relationship and continuity in the senses outlined above, so that a defendant's racketeering activities form a pattern only if they are characteristic either of organized crime in the traditional sense, or of an organized-crime-type perpetrator, that is, of an association dedicated to the repeated commission of criminal of-

---

[4] Insofar as the concurrence seems to suggest, *post*, at 253–254, that very short periods of criminal activity that do *not* in any way carry a threat of continued criminal activity constitute "obvious racketeer[ing]" to which Congress intended RICO, with its enhanced penalties, to apply, we have concluded that it is mistaken, and that when Congress said predicates must demonstrate "continuity" before they may form a RICO pattern, it expressed an intent that RICO reach activities that amount to or threaten long-term criminal activity.

fenses.[5]   Like the Court of Appeals' multiple scheme rule, however, the argument for reading an organized crime limitation into RICO's pattern concept, whatever the merits and demerits of such a limitation as an initial legislative matter, finds no support in the Act's text, and is at odds with the tenor of its legislative history.

One evident textual problem with the suggestion that predicates form a RICO pattern only if they are indicative of an organized crime perpetrator—in either a traditional or functional sense—is that it would seem to require proof that the racketeering acts were the work of an association or group, rather than of an individual acting alone.   RICO's language supplies no grounds to believe that Congress meant to impose such a limit on the Act's scope.   A second indication from the text that Congress intended no organized crime limitation is that no such restriction is explicitly stated.   In those titles of OCCA where Congress did intend to limit the new law's application to the context of organized crime, it said so.   Thus Title V, authorizing the witness protection program, stated that the Attorney General may provide for the security of witnesses "in legal proceedings against any person alleged to have participated in an organized criminal activity."   84 Stat. 933, note preceding 18 U. S. C. § 3481

---

[5] See Brief for Washington Legal Foundation as *Amicus Curiae* 11, 15–16; Brief for American Federation of Labor and Congress of Industrial Organizations as *Amicus Curiae* 17.   See also Briefs for National Association of Manufacturers, and for American Institute of Certified Public Accountants, as *Amici Curiae.*

Lower courts have rejected various forms of the argument that RICO should be limited in scope, through one or another of its terms or concepts, to organized crime.   See, *e. g., Sedima, S. P. R. L.* v. *Imrex Co.,* 741 F. 2d 482, 492, n. 32 (CA2 1984) (citing cases), rev'd, 473 U. S. 479 (1985); *Moss* v. *Morgan Stanley Inc.,* 719 F. 2d 5, 21 (CA2 1983) ("The language of the statute . . . does not premise a RICO violation on proof or allegations of any connection with organized crime"), cert. denied *sub nom. Moss* v. *Newman,* 465 U. S. 1025 (1984); *Schacht* v. *Brown,* 711 F. 2d 1343, 1353–1356 (CA7 1983).

(since repealed). And Title VI permitted the deposition of a witness to preserve testimony for a legal proceeding, upon motion by the Attorney General certifying that "the legal proceeding is against a person who is believed to have participated in an organized criminal activity." 18 U. S. C. § 3503(a). Moreover, Congress' approach in RICO can be contrasted with its decision to enact explicit limitations to organized crime in other statutes. *E. g.*, Omnibus Crime Control and Safe Streets Act of 1968, § 601(b), Pub. L. 90–351, 82 Stat. 209 (defining "organized crime" as "the unlawful activities of the members of a highly organized, disciplined association engaged in supplying illegal goods and services, including but not limited to gambling, prostitution, loan sharking, narcotics, labor racketeering, and other unlawful activities of members of such organizations"). Congress' decision not explicitly to limit RICO's broad terms strongly implies that Congress had in mind no such narrow and fixed idea of what constitutes a pattern as that suggested by *amici* here.

It is argued, nonetheless, that Congress' purpose in enacting RICO, as revealed in the Act's title, in OCCA's preamble, 84 Stat. 923 (Congress seeking "the eradication of organized crime in the United States"), and in the legislative history, was to combat organized crime; and that RICO's broad language should be read narrowly so that the Act's scope is coextensive with this purpose. We cannot accept this argument for a narrowing construction of the Act's expansive terms.

To be sure, Congress focused on, and the examples used in the debates and reports to illustrate the Act's operation concern, the predations of mobsters. Organized crime was without a doubt Congress' major target, as we have recognized elsewhere. See *Russello*, 464 U. S., at 26; *Turkette*, 452 U. S., at 591. But the definition of a "pattern of criminal conduct" in Title X of OCCA in terms only of the relationship between criminal acts, see *supra*, at 240, shows that Con-

gress was quite capable of conceiving of "pattern" as a flexible concept not dependent on tying predicates to the major objective of the law, which for Title X as for Title IX was the eradication of organized crime. See 84 Stat. 923. Title X's definition of "pattern" should thus create a good deal of skepticism about any claim that, despite the capacious language it used, Congress must have intended the RICO pattern element to pick out only racketeering activities with an organized crime nexus. And, indeed, the legislative history shows that Congress knew what it was doing when it adopted commodious language capable of extending beyond organized crime.

Opponents criticized OCCA precisely because it failed to limit the statute's reach to organized crime. See, *e. g.,* S. Rep. No. 91–617, at 215 (Sens. Hart and Kennedy complaining that the OCCA bill "goes beyond organized criminal activity"). In response, the statute's sponsors made evident that the omission of this limit was no accident, but a reflection of OCCA's intended breadth. Senator McClellan was most plain in this respect:

> "The danger posed by organized crime-type offenses to our society has, of course, provided the occasion for our examination of the working of our system of criminal justice. But should it follow . . . that any proposals for action stemming from that examination be limited to organized crime?
>
> "[T]his line of analysis . . . is seriously defective in several regards. Initially, it confuses the occasion for reexamining an aspect of our system of criminal justice with the proper scope of any new principle or lesson derived from that reexamination.
>
> .    .    .    .    .
>
> "In addition, the objection confuses the role of the Congress with the role of a court. Out of a proper sense of their limited lawmaking function, courts ought to confine their judgments to the facts of the cases before

them. But the Congress in fulfilling its proper legislative role must examine not only individual instances, but whole problems. In that connection, it has a duty not to engage in piecemeal legislation. Whatever the limited occasion for the identification of a problem, the Congress has the duty of enacting a principled solution to the entire problem. Comprehensive solutions to identified problems must be translated into well integrated legislative programs.

"The objection, moreover, has practical as well as theoretical defects. Even as to the titles of [the OCCA bill] needed primarily in organized crime cases, there are very real limits on the degree to which such provisions can be strictly confined to organized crime cases. . . . On the other hand, each title . . . which is justified primarily in organized crime prosecutions has been confined to such cases to the maximum degree possible, while preserving the ability to administer the act and its effectiveness as a law enforcement tool." 116 Cong. Rec. 18913–18914 (1970).

Representative Poff, another sponsor of the legislation, also answered critics who complained that a definition of "organized crime" was needed:

"It is true that there is no organized crime definition in many parts of the bill. This is, in part, because it is probably impossible precisely and definitively to define organized crime. But if it were possible, I ask my friend, would he not be the first to object that in criminal law we establish procedures which would be applicable only to a certain type of defendant?" *Id.*, at 35204.

See also *id.*, at 35344 (Rep. Poff) ("organized crime" simply "a shorthand method of referring to a large and varying group of individual criminal offenses committed in diverse circumstances," not a precise concept).

The thrust of these explanations seems to us reasonably clear. The occasion for Congress' action was the perceived need to combat organized crime. But Congress for cogent reasons chose to enact a more general statute, one which, although it had organized crime as its focus, was not limited in application to organized crime. In Title IX, Congress picked out as key to RICO's application broad concepts that might fairly indicate an organized crime connection, but that it fully realized do not either individually or together provide anything approaching a perfect fit with "organized crime." See, e. g., id., at 18940 (Sen. McClellan) ("It is impossible to draw an effective statute which reaches most of the commercial activities of organized crime, yet does not include offenses commonly committed by persons outside organized crime as well").

It seems, moreover, highly unlikely that Congress would have intended the pattern requirement to be interpreted by reference to a concept that it had itself rejected for inclusion in the text of RICO at least in part because "it is probably impossible precisely and definitively to define." Id., at 35204 (Rep. Poff). Congress realized that the stereotypical view of organized crime as consisting in a circumscribed set of illegal activities, such as gambling and prostitution—a view expressed in the definition included in the Omnibus Crime Control and Safe Streets Act, and repeated in the OCCA preamble—was no longer satisfactory because criminal activity had expanded into legitimate enterprises. See United States v. Turkette, 452 U. S., at 590–591. Title 18 U. S. C. § 1961(1) (1982 ed., Supp. V), with its very generous definition of "racketeering activity," acknowledges the breakdown of the traditional conception of organized crime, and responds to a new situation in which persons engaged in long-term criminal activity often operate *wholly* within legitimate enterprises. Congress drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators

operating in many different ways.   It would be counterpro-
ductive and a mismeasure of congressional intent now to
adopt a narrow construction of the statute's pattern element
that would require proof of an organized crime nexus.

As this Court stressed in *Sedima*, in rejecting a pinched
construction of RICO's provision for a private civil action,
adopted by a lower court because it perceived that RICO's
use against non-organized-crime defendants was an "abuse"
of the Act, "Congress wanted to reach both 'legitimate' and
'illegitimate' enterprises."   473 U. S., at 499.   Legitimate
businesses "enjoy neither an inherent incapacity for criminal
activity nor immunity from its consequences"; and, as a re-
sult, § 1964(c)'s use "against respected businesses allegedly
engaged in a pattern of specifically identified criminal con-
duct is hardly a sufficient reason for assuming that the provi-
sion is being misconstrued."   *Ibid.*   If plaintiffs' ability to
use RICO against businesses engaged in a pattern of criminal
acts is a defect, we said, it is one "inherent in the statute
as written," and hence beyond our power to correct.   *Ibid.*
RICO may be a poorly drafted statute; but rewriting it is a
job for Congress, if it is so inclined, and not for this Court.
There is no more room in RICO's "self-consciously expansive
language and overall approach" for the imposition of an orga-
nized crime limitation than for the "amorphous 'racketeering
injury' requirement" we rejected in *Sedima*, see *id.*, at 495,
498.   We thus decline the invitation to invent a rule that
RICO's pattern of racketeering concept requires an allega-
tion and proof of an organized crime nexus.

## IV

We turn now to the application of our analysis of RICO's
pattern requirement.   Because respondents prevailed on a
motion under Federal Rule of Civil Procedure 12(b)(6), we
read the facts alleged in the complaint in the light most favor-
able to petitioners.   And we may only affirm the dismissal of
the complaint if "it is clear that no relief could be granted

under any set of facts that could be proved consistent with the allegations." *Hishon* v. *King & Spalding,* 467 U. S. 69, 73 (1984).

Petitioners' complaint alleges that at different times over the course of at least a 6-year period the noncommissioner respondents gave five members of the MPUC numerous bribes, in several different forms, with the objective—in which they were allegedly successful—of causing these commissioners to approve unfair and unreasonable rates for Northwestern Bell. RICO defines bribery as a "racketeering activity," 18 U. S. C. § 1961(1), so petitioners have alleged multiple predicate acts.

Under the analysis we have set forth above, and consistent with the allegations in their complaint, petitioners may be able to prove that the multiple predicates alleged constitute "a pattern of racketeering activity," in that they satisfy the requirements of relationship and continuity. The acts of bribery alleged are said to be related by a common purpose, to influence commissioners in carrying out their duties in order to win approval of unfairly and unreasonably high rates for Northwestern Bell. Furthermore, petitioners claim that the racketeering predicates occurred with some frequency over at least a 6-year period, which may be sufficient to satisfy the continuity requirement. Alternatively, a threat of continuity of racketeering activity might be established at trial by showing that the alleged bribes were a regular way of conducting Northwestern Bell's ongoing business, or a regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise, the MPUC.

The Court of Appeals thus erred in affirming the District Court's dismissal of petitioners' complaint for failure to plead "a pattern of racketeering activity." The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE KENNEDY join, concurring in the judgment.

Four Terms ago, in *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479 (1985), we gave lower courts the following four clues concerning the meaning of the enigmatic term "pattern of racketeering activity" in the Racketeer Influenced and Corrupt Organizations Act (RICO or Act), Pub. L. 91–452, Title IX, 84 Stat. 941, as amended, 18 U. S. C. §§ 1961–1968 (1982 ed. and Supp. V). First, we stated that the statutory definition of the term in 18 U. S. C. § 1961(5) implies "that while two acts are necessary, they may not be sufficient." *Sedima*, 473 U. S., at 496, n. 14. Second, we pointed out that "two isolated acts of racketeering activity," "sporadic activity," and "proof of two acts of racketeering activity, without more" would not be enough to constitute a pattern. *Ibid.* Third, we quoted a snippet from the legislative history stating "[i]t is this factor of *continuity plus relationship* which combines to produce a pattern." *Ibid.* Finally, we directed lower courts' attention to 18 U. S. C. § 3575(e), which defined the term "pattern of conduct which was criminal" used in a different title of the same Act, and instructed them that "[t]his language may be useful in interpreting other sections of the Act," 473 U. S., at 496, n. 14. Thus enlightened, the District Courts and Courts of Appeals set out "to develop a meaningful concept of 'pattern,'" *id.*, at 500, and promptly produced the widest and most persistent Circuit split on an issue of federal law in recent memory, see, *e. g., ante*, at 235, n. 2. Today, four years and countless millions in damages and attorney's fees later (not to mention prison sentences under the criminal provisions of RICO), the Court does little more than repromulgate those hints as to what RICO means, though with the caveat that Congress intended that they be applied using a "flexible approach." *Ante*, at 238.

Elevating to the level of statutory text a phrase taken from the legislative history, the Court counsels the lower courts: "'continuity plus relationship.'" *Ante*, at 239 (emphasis deleted). This seems to me about as helpful to the conduct of their affairs as "life is a fountain." Of the two parts of this talismanic phrase, the relatedness requirement is said to be the "easier to define," *ibid.*, yet here is the Court's definition, *in toto:* "'[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events,'" *ante*, at 240. This definition has the feel of being solidly rooted in law, since it is a direct quotation of 18 U. S. C. § 3575(e). Unfortunately, if normal (and sensible) rules of statutory construction were followed, the existence of § 3575(e)—which is the definition contained in another title of the Act that was explicitly *not* rendered applicable to RICO—suggests that *whatever* "pattern" might mean in RICO, it assuredly *does not* mean that. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello* v. *United States*, 464 U. S. 16, 23 (1983). But that does not really matter, since § 3575(e) is utterly uninformative anyway. It hardly closes in on the target to know that "relatedness" refers to acts that are related by "purposes, results, participants, victims, . . . methods of commission, *or* [just in case that is not vague enough] *otherwise*." Is the fact that the victims of both predicate acts were women enough? Or that both acts had the purpose of enriching the defendant? Or that the different coparticipants of the defendant in both acts were his coemployees? I doubt that the lower courts will find the Court's instructions much more helpful than telling them to look for a "pattern"—which is what the statute already says.

The Court finds "continuity" more difficult to define precisely. "Continuity," it says, "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Ante*, at 241. I have no idea what this concept of a "closed period of repeated conduct" means. Virtually all allegations of racketeering activity, in both civil and criminal suits, will relate to past periods that are "closed" (unless one expects plaintiff or the prosecutor to establish that the defendant not only committed the crimes he did, but is still committing them), and all of them *must* relate to conduct that is "repeated," because of RICO's multiple-act requirement. I had thought, initially, that the Court was seeking to draw a distinction between, on the one hand, past repeated conduct (multiple racketeering acts) that is "closed-ended" in the sense that, in its totality, it constitutes only one criminal "scheme" or "episode"—which would not fall within RICO unless in its nature (for one or more of the reasons later described by the Court, see *ante*, at 242–243) it threatened future criminal endeavors as well—and, on the other hand, past repeated conduct (multiple racketeering acts) that constitutes several separate schemes—which is alone enough to invoke RICO. But of course that cannot be what it means, since the Court rejects the "multiple scheme" concept, not merely as the *exclusive* touchstone of RICO liability, see *ante*, at 240, but in all its applications, since it "introduc[es] a concept . . . that appears nowhere in the language or legislative history of the Act," *ante*, at 241, and is so vague and "amorphous" as to exist only "in the eye of the beholder," *ante*, at 241, n. 3. Moreover, the Court tells us that predicate acts extending, not over a "substantial period of time," but only over a "few weeks or months and threatening no future criminal conduct" do not satisfy the continuity requirement. *Ante*, at 242. Since the Court has rejected the concept of separate criminal "schemes" or "episodes" as a criterion of "threatening future criminal conduct,"

I think it must be saying that at least a few months of racketeering activity (and who knows how much more?) is generally for free, as far as RICO is concerned. The "closed period" concept is a sort of safe harbor for racketeering activity that does not last *too* long, no matter how many different crimes and different schemes are involved, so long as it does not otherwise "establish a threat of continued racketeering activity," *ibid.* A gang of hoodlums that commits one act of extortion on Monday in New York, a second in Chicago on Tuesday, a third in San Francisco on Wednesday, and so on through an entire week, and then finally and completely disbands, cannot be reached under RICO. I am sure that is not what the statute intends, but I cannot imagine what else the Court's murky discussion can possibly mean.

Of course it cannot be said that the Court's opinion operates only in the direction of letting some obvious racketeers get out of RICO. It also makes it clear that a hitherto dubious category is included, by establishing the rule that the "multiple scheme" test applied by the Court of Appeals here is not only nonexclusive but indeed nonexistent. This is, as far as I can discern, the Court's only substantive contribution to our prior guidance—and it is a contribution that makes it *more* rather than *less* difficult for a potential defendant to know whether his conduct is covered by RICO. Even if he is only involved in a single scheme, he may still be covered if there is present whatever is needed to establish a "threat of continuity." The Court gives us a nonexclusive list of three things that do so. Two of those presumably polar examples seem to me extremely difficult to apply—whether "the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes," *ante*, at 243, and whether "the predicates are a regular way of conducting defendant's ongoing legitimate business," *ibid.* What is included beyond these examples is vaguer still.

It is, however, unfair to be so critical of the Court's effort, because I would be unable to provide an interpretation of

RICO that gives significantly more guidance concerning its application. It is clear to me from the prologue of the statute, which describes a relatively narrow focus upon "organized crime," see Statement of Findings and Purpose, The Organized Crime Control Act of 1970, Pub. L. 91–452, 84 Stat. 922–923, that the word "pattern" in the phrase "pattern of racketeering activity" was meant to import some requirement beyond the mere existence of multiple predicate acts. Thus, when § 1961(5) says that a pattern "requires at least two acts of racketeering activity" it is describing what is needful but not sufficient. (If that were not the case, the concept of "pattern" would have been unnecessary, and the statute could simply have attached liability to "multiple acts of racketeering activity"). But what that something more is, is beyond me. As I have suggested, it is also beyond the Court. Today's opinion has added nothing to improve our prior guidance, which has created a kaleidoscope of Circuit positions, except to clarify that RICO may in addition be violated when there is a "threat of continuity." It seems to me this increases rather than removes the vagueness. There is no reason to believe that the Courts of Appeals will be any more unified in the future, than they have in the past, regarding the content of this law.

That situation is bad enough with respect to any statute, but it is intolerable with respect to RICO. For it is not only true, as JUSTICE MARSHALL commented in *Sedima, S. P. R. L.* v. *Imrex Co.*, 473 U. S. 479 (1985), that our interpretation of RICO has "quite simply revolutionize[d] private litigation" and "validate[d] the federalization of broad areas of state common law of frauds," *id.*, at 501 (dissenting opinion), so that clarity and predictability in RICO's civil applications are particularly important; but it is also true that RICO, since it has criminal applications as well, must, even in its civil applications, possess the degree of certainty required for criminal laws, *FCC* v. *American Broadcasting Co.*, 347 U. S. 284, 296 (1954). No constitutional challenge

to this law has been raised in the present case, and so that issue is not before us. That the highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when that challenge is presented.

However unhelpful its guidance may be, however, I think the Court is correct in saying that nothing in the statute supports the proposition that predicate acts constituting part of a single scheme (or single episode) can never support a cause of action under RICO. Since the Court of Appeals here rested its decision on the contrary proposition, I concur in the judgment of the Court reversing the decision below.